IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                                        |   |                                  |
|----------------------------------------|---|----------------------------------|
|                                        | : |                                  |
| BENJAMIN BARAGAR SNYDER by             |   |                                  |
| and through his parents and            | : |                                  |
| next friends, Lillian and              |   |                                  |
| Edward Snyder                          | : |                                  |
|                                        |   |                                  |
| v.                                     | : | Civil Action No. DKC 2008-1757   |
|                                        |   |                                  |
|                                        | : |                                  |
| MONTGOMERY COUNTY PUBLIC               |   |                                  |
|  SCHOOLS                               | : |                                  |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action arising under the Individuals with Disabilities Education Act ("IDEA") are: (1) a motion for summary judgment filed by Plaintiff Benjamin Baragar Snyder by and through his parents Lillian and Edward Snyder (Paper 14); (2) a cross-motion for summary judgment filed by Defendants Montgomery County Public Schools ("MCPS") and Jerry D. Weast (Paper 16); and (3) a motion for leave to file a surreply, or in the alternative, motion to strike filed by Plaintiffs (Paper 23).[1]  The issues are fully briefed and the court

---

[1] Identifying the formal parties in this case is somewhat confusing.  The complaint's caption names only Benjamin Baragar Snyder, by and through his parents, as the Plaintiff, but his parents are named separately in the body.  Moreover, while the complaint names as Defendants both Montgomery County Public Schools and Jerry Weast, Superintendent of Schools, in his official capacity, the docket shows only a single plaintiff and a single defendant.  The service documents refer to Mr. Weast, but are docketed as applying to Montgomery County.  The answer, however, was filed on behalf of both defendants.  For consistency, this opinion will refer to both the child and his parents as "Plaintiffs" and to MCPS and Mr. Weast, collectively, as "Defendant."

now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, Plaintiffs' motion for leave to file surreply and motion to strike will be denied, Plaintiffs' motion for summary judgment will be denied, and Defendant's cross-motion for summary judgment will be granted.

## I.   The Individuals with Disabilities Education Act

The IDEA, 20 U.S.C. § 1400 *et seq.*, and accompanying regulations, 34 C.F.R. § 300 *et seq.*, require all states that receive federal funds for education to provide all disabled children between the ages of three and twenty-one with a free and appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1)(A). Maryland's regulations governing the provision of a FAPE to children with disabilities in accordance with the IDEA are found at Md. Code Regs. 13A.05.01.

The FAPE guaranteed by the IDEA must provide a disabled child with meaningful access to the educational process.  *See Bd. of Educ. of Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982).  The FAPE must be reasonably calculated to confer "some educational benefit" on the disabled child.  *Id*. at 200.  The benefit must also be provided in the least restrictive environment appropriate to the child's needs, with the disabled child participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550.  The IDEA does not

2

require that a school district provide a disabled child with the best possible education, *Rowley*, 458 U.S. at 192, or that the education maximize each child's potential, *see Hartmann by Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997), *cert. denied*, 522 U.S. 1046 (1998). The benefit conferred, however, must amount to more than trivial progress. *See Reusch v. Fountain*, 872 F.Supp. 1421, 1425 (D.Md. 1994) (*Rowley's* "'some educational benefit' prong will not be met by the provision of *de minimis*, trivial learning opportunities") (citing *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir. 1985)).

To assure delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined to be disabled. 20 U.S.C. § 1414(d). That IEP is formulated by a team ("IEP Team") consisting of the parents or guardian of the child, a representative of the school district, the child's regular and special education teachers, an individual who can interpret results of evaluations of the child, and, when appropriate, the child himself or herself. 20 U.S.C. § 1414(d)(1)(B); Md.Code Regs. 13A.05.01.07(A). The IEP must state the student's current educational status, annual goals for the student's education, the special educational services and other aids that will be provided to the child to meet those goals, and the extent to which the child will be "mainstreamed," *i.e.*,

spend time in regular school environments with non-disabled students. 20 U.S.C. § 1414(d)(1)(A).

The IDEA provides a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions." *MM ex rel. DM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 527 (4th Cir. 2002) (internal quotation marks and citation omitted); *see also* 20 U.S.C. § 1415. Among those safeguards, a parent must be provided prior written notice of a decision to propose or change the educational placement of a student. Md.Code Regs. 13A.05.01.13(B). A parent may also request a meeting at any time to review and, as appropriate, revise the student's IEP. Md.Code Regs. 13A.05.01.08 (B)(3).

If the parents are not satisfied with the IEP, they may present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6). After such a complaint has been received, the parents are entitled to request a due process hearing conducted by the state or local educational agency. 20 U.S.C. § 1415(f). In Maryland, the Maryland Office of Administrative Hearings conducts the due process hearing. Md.Code Ann., Educ. § 8-413; Md.Code Regs. 13A.05.01.15(C)(1). Any party can then appeal the

administrative ruling to federal or state court.  Md.Code Ann., Educ. § 8-413(h).

When a FAPE is not provided to a disabled student, the student's parent may place the child in a private school and seek reimbursement for the cost of the private school from the state. *See Sch. Comm. of Burlington v. Dep't of Ed.*, 471 U.S. 359, 369-70 (1985).  To establish entitlement to reimbursement for unilateral private placement, certain conditions must be met.  Title 20, § 1412(a)(10)(C)(ii), states:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment.

Reimbursement may be reduced or denied if:

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a [FAPE] to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the

5

>           public agency of the information described in
>           division (aa).

20 U.S.C. § 1412(a)(10)(C)(iii)(I).[2]  Finally, in order to receive

reimbursement, the private education services obtained by the

parents must be appropriate to meet the child's needs.  *Sch. Comm.*

*of Burlington*, 471 U.S. at 370.

## II.  Background

Benjamin Snyder is a twelve-year-old boy who has been

diagnosed with Global Neurocognitive Disorder and moderate to

severe mental retardation, and has an educational code of mental

retardation.  Ben is social and engaging, but is virtually non-

verbal and has severely impaired fine motor skills.  He has

significant interfering behaviors which impact his educational

abilities.  These behaviors include leaving his desk and walking

around the classroom, grabbing, tearing, and throwing objects, and

pinching, hitting, and pulling hair.  As a result of his profound

deficits, Ben has very low adaptive functioning in the areas of

self-care and community living.

The 2004-05 school year was the first year Ben resided in

Montgomery County, Maryland.  Prior to the 2004-05 school year, Ben

---

[2]  Reimbursement can also be reduced or denied if, prior to
removal of the child, the school notifies the parents of its intent
to evaluate the child and the parent does not make the child
available for such evaluation, or upon a judicial finding of
unreasonableness with respect to actions taken by the parents.  20
U.S.C. §§ 1412(a)(10)(C)(iii)(I), (II).  *See also Forest Grove Sch.
Dist. v. T.A.*, ___ U.S. ___, 129 S.Ct. 2484 (2009).

lived in Arlington County, Virginia, and Fairfax County, Virginia, where he attended special education programs.  On August 18, 2004, the MCPS IEP team met and agreed to continue Ben's Fairfax County IEP.  Ben was placed in the self-contained Community Based Program at Wayside Elementary School ("Wayside"), a public school.  Ben's teacher was Gretchen Solender and his speech/language pathologist was Katherine Hanson.

On January 10, 2005, an IEP meeting was held to formulate an IEP for Ben for the next twelve months.  The IEP was reviewed and approved, and Ben's placement continued at Wayside for the remainder of the 2004-05 school year.  The IEP team met again on March 3, 2005.  Dr. Walter Siggers, MCPS School Psychologist, recommended that Ben undergo psychological and educational assessments.  The team did not develop a new IEP at this meeting.

Approximately three weeks after the March 2005 meeting, Ben's mother, Lillian Trippett Snyder ("Ms. Snyder"), informed Ms. Solender that she was having Ben privately evaluated.[3]  The private assessments consisted of a language processing evaluation by Dr. Linda Spencer, an educational consultation by Suzanne Keith Blattner, and a neuropsychological consultation by Dr. Vincent

---

[3] Lillian Trippett Snyder was referred to throughout the administrative proceedings as "Ms. Trippett" or "the Mother."  The complaint was filed under her married name, Lillian Snyder.  The court will refer to her as "Ms. Snyder."

Culotta.  Dr. Spencer also observed Ms. Hanson working with Ben at Wayside on April 28, 2005.

In the meantime, Ms. Snyder submitted an application for Ben's admission to The Benedictine School, a private residential school. On June 6, 2005, Ben was accepted for admission to the Structured Teaching Approach for Readiness Skills ("S.T.A.R.S.") at Benedictine.  Ms. Snyder requested financial assistance from Benedictine for Ben's tuition.

An IEP meeting was scheduled for June 9, 2005, to review the assessments that Ms. Snyder obtained privately.  The meeting was postponed because Ms. Snyder had not received reports from the experts she had retained to evaluate Ben.  On June 7, 2005, Ms. Solender informed Ms. Snyder that MCPS would like to hold the meeting during the summer or early September.  Ms. Kim, the principal of Wayside, called Ms. Snyder four or five times between September 2005 and March 2006 to ask about the reports.

On July 6, 2005, Ms. Snyder sent a letter to Ms. Kim stating that she did not believe that Ben made meaningful progress at Wayside and that he was in need of a highly structured residential program.  In the letter, Ms. Snyder also informed Ms. Kim that Ben would be attending Benedictine for the 2005-06 school year, and she requested reimbursement for this placement.  Ms. Kim responded on July 13, 2005, declining to fund Ben's placement at Benedictine and

8

informing Ms. Snyder that MCPS was prepared to complete Ben's recommended assessments, or to review the private assessments.

Ben enrolled at Benedictine on September 6, 2005. On March 20, 2006, Ms. Snyder sent the private assessments of Dr. Spencer, Dr. Culotta, and Ms. Blattner to Ms. Kim. Ms. Snyder also included Ben's draft IEP from Benedictine, Benedictine's behavior intervention plan, Benedictine progress reports, an occupational therapy sensory evaluation report, and an observation of Ben conducted by Ms. Blattner at Benedictine. An IEP meeting was held on July 25, 2006, to review the private assessments and additional documents. The IEP team reconvened on August 11, 2006, to complete an IEP for the 2006-07 school year. The IEP team decided that Ben would remain at Benedictine. Reimbursement for the 2005-06 school year was not discussed at the IEP meetings.

Ben's parents requested a due process hearing on June 18, 2007. The hearing was held before Administrative Law Judge Richard O'Connor at the Maryland Office of Administrative Hearings on November 13, 14, 15, and 16, 2007, and February 19 and March 11, 2008. The parents sought reimbursement for the cost of tuition, room and board, transportation, and all other related expenses at Benedictine for the 2005-06 school year. Judge O'Connor issued a written decision on April 9, 2008, finding that Ben had not been denied a FAPE at Wayside during the 2005-06 academic year and the parents were not entitled to reimbursement.

Ben and his parents subsequently filed this complaint on July 7, 2008, seeking reimbursement for expenses associated with Ben's placement at Benedictine.  (Paper 1).  Plaintiffs filed a motion for summary judgment on November 24, 2008 (Paper 14), and Defendant filed a cross-motion for summary judgment on January 26, 2009.  (Paper 16).  After the cross-motions for summary judgment were fully briefed, Plaintiffs filed a motion for leave to file surreply, or in the alternative, a motion to strike all or parts of Defendant's reply to Plaintiffs' cross-motion for summary judgment.  (Paper 23).

**III. Cross-Motions for Summary Judgment**

   **A.    Standard of Review**

   In *MM ex. rel. DM*, 303 F.3d at 530-31, the United States Court of Appeals for the Fourth Circuit explained the standard of review for motions for summary judgment in IDEA cases:

> In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified *de novo* review, giving "due weight" to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be *prima facie* correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.  The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities. . . .

(internal marks and citations omitted).  General standards of review for summary judgment motions also apply in IDEA cases, as

illustrated in *Bd. of Educ. of Frederick County v. I.S. ex rel. Summers*, 325 F.Supp.2d 565, 578 (D.Md. 2004):

> In addition, the Court's analysis is shaped by the mandate of Rule 56(c) of the Federal Rules of Civil Procedure that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "When the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e)). The Court's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant resolution of the matter at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where, as here, cross-motions for summary judgment are filed, a court must "evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

As this court discussed previously in *Wagner v. Bd. of Educ. of Montgomery County*, 340 F.Supp.2d 603 (D.Md. 2004), Plaintiffs in IDEA cases face an uphill battle for several reasons. First, just

11

as Plaintiffs were required to carry the burden of proof in the administrative hearing, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005), they also must carry that burden in this court, *I.S. ex rel. Summers*, 325 F.Supp.2d at 578 ("the party challenging the administrative findings . . . bears the burden of proof of establishing a violation of the IDEA"). *See also Cavanagh v. Grasmick*, 75 F.Supp.2d 446, 457 (D.Md. 1999)). Second, "[i]f the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct." *Cavanaugh*, 75 F.Supp.2d at 457 (citing *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991)). Moreover, in according "due weight" to the findings of the Administrative Law Judge ("ALJ"), this court owes deference to the ALJ's determinations of witness credibility.

### B.   Analysis

Plaintiffs contend that the ALJ's findings were incorrect and should be reversed for several reasons: (1) the ALJ committed procedural violations that constitute a denial of a FAPE; (2) the ALJ failed to recognize that the IEP developed by MCPS for the 2005-06 school year was substantively deficient; (3) the ALJ failed to recognize that Benedictine provided Ben a FAPE during the 2005-06 school year; (4) the ALJ's legal findings were not supported by law; and (5) the ALJ's findings of fact were not made in a regular manner.

1.   **Procedural Violations**

Plaintiffs argue that the MCPS committed procedural violations of the IDEA by failing to complete assessments of Ben in the spring of 2005, following the March 2005 IEP meeting, and by failing to hold a timely IEP meeting to address the concerns raised in the July 6, 2005, letter.  Defendant counters that because the parents did not allege either of these violations in their due process hearing request, Judge O'Connor never had an opportunity to address whether these alleged violations resulted in denial of a FAPE. Nevertheless, Defendant contends, any procedural violation was harmless.

Ordinarily, procedural violations of IDEA are subject to harmlessness analysis.  As the Fourth Circuit explained in *DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester County*, 309 F.3d 184, 190 (4th Cir. 2002), "[t]o the extent that the procedural violations did not actually interfere with the provision of a free appropriate public education, these violations are not sufficient to support a finding that an agency failed to provide a free appropriate public education." (Quoting *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997)).  The court also reiterated that "under our circuit precedent, a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief," even where the

procedural violation "causes interference with the parents' ability to participate in the development of their child's IEP." *DiBuo*, 309 F.3d at 190-91 (4th Cir. 2002); *see also A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679 n.7 (noting that procedural violations are subject to "harmlessness analysis," while substantive violations of the IDEA are not).

### a.   MCPS's Failure to Complete Assessments

Plaintiffs cannot prevail on this argument because they did not properly preserve it for review at the administrative hearing. An allegation that a school district violated the IDEA may only be considered by a reviewing court if that issue was first presented and preserved before the administrative law judge at the administrative hearing. *A.K. ex rel. J.K.*, 484 F.3d at 679 n.7 (citing *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 424 (1st Cir. 1985)). This limitation serves the same purpose as the limitations that apply to the presentation of additional evidence before a district court in a case under the IDEA, namely, to avoid "reduc[ing] the proceedings before the state agency to a mere dress rehearsal." *Springer v. Fairfax Co. Sch. Bd.*, 134 F.3d 659, 667 (4th Cir. 1998) (internal marks omitted). Moreover, an allegation of an IDEA violation may only be presented in an administrative hearing if the allegation was set forth in the hearing request notice required by 20 U.S.C. § 1415(b)(7), or if the parties at the administrative hearing agreed to the presentation and determination

of additional issues.   "The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7) of this section, unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B).

Here, Plaintiffs failed to allege in their initial hearing request, on June 18, 2007, or their amended hearing request, on October 9, 2007, that MCPS failed to conduct reevaluations of Ben. Rather, Plaintiffs alleged:

> [Ms. Snyder] obtained independent educational, neuropsychological, and speech/language evaluations which she shared with MCPS.  MCPS personnel reviewed and accepted the private evaluations.

(MCPS Ex. 31).  Plaintiffs contend that the ALJ did address MCPS's failure to complete its assessments of Ben, but erroneously excused its failure because it was MCPS's policy not to perform evaluations when the parents concurrently decide to have private evaluations completed.   Because the alleged failure by MCPS to conduct assessments following the March 2005 IEP meeting was not specifically raised in Plaintiffs' administrative hearing requests, Plaintiffs could not raise this issue at the administrative hearing, "unless the other party [here, MCPS] agree[d] otherwise." 20 U.S.C. § 1415(f)(3)(B).  As no such agreement was reached, Plaintiffs' argument in this regard cannot and will not be addressed.

15

b.    **Failure to Convene an IEP Meeting**

Plaintiffs also argue that Defendant failed to convene an IEP meeting following the July 6, 2005, letter.   Plaintiffs alleged in their amended hearing request that "MCPS violated Ben's rights by making a placement decision without convening an IEP meeting." (MCPS Ex. 31).[4]   Defendant insists that the meeting never took place because Ms. Snyder requested that it be postponed.   The ALJ found as follows:

> On July 13, 2005, Ms. Kim informed Ms. [Snyder] that MCPS declined to fund Ben's placement at Benedictine.   Ms. Kim further explained that MCPS was prepared to complete the psychological and educational assessments recommended at the March 3, 2005, meeting, or review privately-obtained assessments provided by the Parents.

(ALJ Decision, at 17 (citing MCPS Ex. 21)).   The July 13, 2005, letter states:

> MCPS remains prepared to complete the recommended assessments, or to review the private assessments you indicated you were seeking, on an expedited basis.   Once the information is reviewed, the IEP team will be in a better position to address your concerns regarding Benjamin's progress and make any necessary adjustments to his IEP and placement.   As such, MCPS is declining to fund Benjamin's placement at Benedictine at this time.

---

[4] Defendant apparently overlooks Plaintiffs' amended hearing request, as Defendant insists that Plaintiffs raised this issue for the first time in closing argument at the due process hearing, and then only obliquely.

> I am requesting that you allow MCPS to
> complete the evaluation process by either
> performing the recommended assessments or by
> reviewing private assessments when they are
> available.  As part of the evaluation process,
> after the assessments are considered by the
> IEP team, the team will review Benjamin's
> current IEP and make any necessary revisions,
> including placement.  In the event that you
> are willing to permit the IEP team proceed
> with the evaluation process, please notify me
> as soon as possible.

(MCPS Ex. 21).  Ms. Snyder did not request that MCPS conduct the
evaluations, but instead informed Ms. Kim that the evaluations
would be done privately.  Ms. Snyder did not provide the requested
private evaluations until March 20, 2006.  The ALJ found that "[b]y
the time the Parents provided the [evaluations] to MCPS, it was too
late to use them to develop an IEP for the 2005-2006 school year."
(ALJ Decision, at 18).  MCPS scheduled an IEP meeting for May 18,
2006, then rescheduled for June 8, 2006.  (*Id.* at 19).

Plaintiffs have failed to demonstrate that MCPS's failure to
convene an IEP meeting denied Ben a FAPE.  As will be more fully
discussed below, Judge O'Connor properly found that Wayside was an
appropriate placement as part of Ben's January 2005 to January 2006
IEP, which offered Ben a FAPE.  "If a disabled child received (or
was offered) a FAPE in spite of a technical violation of the IDEA,
the school district has fulfilled its statutory obligations."
*M.M.*, 303 F.3d at 534 (citing *Burke County Bd. of Educ. v. Denton*,
895 F.2d 973, 982 (4th Cir. 1990)).

2.    **Substantively Deficient 2005-06 IEP**

Plaintiffs assert that the ALJ failed to recognize that the
IEP developed by MCPS for the 2005-06 school year was substantively
deficient.  In describing the August 11, 2006, IEP meeting, Judge
O'Connor wrote:

> [I]n August 2006 the Central IEP Team
> basically acceded to the wishes of the Parents
> and Benedictine to approve Ben's placement at
> Benedictine based on his performance during
> the 2005-2006 school year.  This was done over
> the objections of Ms. Solender, Ms. Hanson,
> and Ms. Mandes, and despite serious doubts by
> Dr. Siggers and Mr. Moore.  Even though the
> placement for 2006-2007 may have been
> appropriate, it has no relevance to Ben's
> placement in 2005-2006.  The IEP developed
> January 10, 2005, placing Ben in the SCBP at
> Wayside, was designed to meet his educational
> needs and allowing him to make progress.  Ben
> did make meaningful educational progress under
> this IEP during the last two quarters of the
> 2004-2005 school year at Wayside as testified
> to and reported by his teachers.

(ALJ Decision, at 38).  Plaintiffs contend that the ALJ erred in
virtually every aspect of the above-quoted passage, as well as in
his legal conclusion.

First, Plaintiffs argue that it was the consensus of the IEP
team at the August 11, 2006, IEP meeting that Ben's needs could not
be met at Wayside, and that Benedictine provided an appropriate
program for him for the 2006-07 school year.  Plaintiffs insist
that it was inaccurate for Judge O'Connor to say that the IEP team
"acceded" to the parents' wishes.  According to Plaintiffs, of the
fifteen members of the IEP team, only one, Elaine Mandes, a general

18

education teacher who never met Ben, expressed disagreement with the decision to place Ben in a residential program.  Plaintiffs further assert that Ms. Solender and Ms. Hanson never voiced disagreement with Ben's placement during the IEP meeting, despite testimony suggesting otherwise.

Second, Plaintiffs argue that Judge O'Connor erred in finding that the IEP team's decision to place Ben at Benedictine for 2006-07 had no relevance with respect to Ben's placement in 2005-06.  Plaintiffs assert that the IEP developed and approved at the August 11, 2006, meeting placed Ben at Benedictine "[d]ue to significant interfering behaviors, sensory issues, health and safety issues, and cognitive deficits, [and because] Ben requires a 24 hour sp[ecial] ed[ucation] and personal care program in order to access the instructional program and to make meaningful educational progress." (Pl. Ex. 56).  According to Plaintiffs, it is axiomatic that because an IEP is designed to meet a disabled child's educational needs, two IEPs addressing the same child should not be markedly different, even if developed in two different time periods.  Plaintiffs conclude that if the January 10, 2005, IEP and the August 11, 2006, IEP were both reasonably calculated to meet Ben's educational needs, they should not be markedly different, and if they are different, one of the IEPs was not reasonably calculated to confer meaningful educational benefit to Ben.

19

Plaintiffs point out numerous differences between the January 10, 2005, IEP and the August 11, 2006, IEP.  First, the January 10, 2005, IEP does not include a behavior intervention plan, but identifies "multi-model communication strategies" to address Ben's interfering behaviors (*i.e.*, wandering, ripping, pinching, throwing, destroying).  By contrast, the August 2006 IEP includes a "Behavioral Intervention Plan" based on a "Functional Behavior Assessment."  Second, the August 2006 IEP also includes goals and objectives to address "Sensory-Motor Coordination" that were not included in the January 2005 IEP.  Third, the August 2006 IEP provides a one-to-one aide that was not included in the January 2005 IEP.  Finally, the August 2006 IEP identifies a "Private Residential School" as the least restrictive environment in which Ben's educational needs could be met.  The January 2005 IEP identifies "Outside the General Education Class More Than 60%" as the least restrictive environment to meet Ben's needs.  Plaintiffs insist that the differences between the IEPs and Ben's failure to make meaningful progress demonstrate that the January 2005 IEP was not reasonably calculated to provide Ben meaningful education benefit.  According to Plaintiffs, the fact that MCPS agreed to provide public funding to continue Ben's placement at Benedictine for a second year demonstrates that Benedictine provided Ben a FAPE during the 2005-06 school year.

The Fourth Circuit recently addressed, and rejected, Plaintiffs' argument in *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470 (4th Cir. 2009). There, the student and his parents argued that "the tenth grade IEP was an admission by the school system that [the student] had a severe auditory processing problem and needed small classes all along, and that the eighth-grade IEP was therefore inappropriate." The court rejected that reasoning, holding:

> To interpret the tenth-grade IEP as an admission of fault as to the eighth-grade IEP would discourage MCPS and other school systems from reassessing and updating IEPs out of fear that any addition to the IEP would be seen as a concession of liability for an earlier one. And it would thereby prevent students . . . from receiving appropriate services as their profiles changed. District courts are free to exercise their discretion in a manner that avoids such results.

*Id.* at 478. Plaintiffs argue that *Schaffer* is factually distinguishable from this case because, here, evidence that Ben's educational needs were the same for the 2005-06 and the 2006-07 school years was presented at the administrative hearing, whereas, in *Schaffer*, new evidence that arose two years after the administrative hearing established that the student's needs were very different.

Plaintiffs are attempting to use the 2006-07 IEP as a tacit admission by MCPS that Ben should have been at Benedictine during the 2005-06 school year. This is precisely the result that the

*Schaffer* court sought to avoid.   Judge O'Connor specifically addressed the logical flaw in Plaintiffs' argument, noting:

> The Parents' argument in support of their request for reimbursement comes down to this syllogism: (1) the IEP for 2006-2007 placing Ben at Benedictine was appropriate to meet Ben's educational needs; (2) Ben's educational needs were the same for the 2005-2006 school year as the 2006-2007 school year; (3) Therefore, the IEP for 2005-2006 must be the same as the IEP for 2006-2007.
>
> The logical fallacy of this argument is that it omits the word "only." To prevail on this issue, the Parents must prove that *only* an IEP placing Ben at Benedictine for 2005-2006 would have met his educational needs and allowed him to make meaningful educational progress.

(ALJ Decision, at 37).

### 3.   ALJ's Legal Findings

Plaintiffs further assert that the ALJ made three erroneous legal findings: (1) that in order to prevail on the issue of reimbursement, the parents had to prove that only an IEP placing Ben at Benedictine for the 2005-06 school year would have met his educational needs, (2) that the parents' delay in providing the private assessments to MCPS impeded their right to reimbursement, and (3) that any progress constitutes meaningful progress.

### a.   2005-06 Educational Needs

Plaintiffs argue that Judge O'Connor erred in holding that in order to prevail on the issue of reimbursement, they had to prove that only an IEP placing Ben at Benedictine for the 2005-06 school

year would have met his educational needs.  Plaintiffs assert that
because Ben's educational needs were the same for the 2005-06 and
2006-07 school years, it logically follows that he needed the same
level of service in 2005-06 as he received at Benedictine in 2006-
07.  Plaintiffs misconstrue Judge O'Connor's reference to the word
"only" in this context.  He did not mean that if the 2005-06 IEP
failed to provide a FAPE, the parents would have to prove that
Benedictine was the only placement that could meet Ben's needs in
order to qualify for reimbursement.  Rather, what he said and meant
was that in order for the 2006-07 IEP, which placed Ben at
Benedictine, to prove categorically that the 2005-06 IEP was
deficient, it would mean that, for 2005-06, a similar placement was
the only placement appropriate for him.  He properly refused to
take that leap in logic.

   b.   **Parents' Delay in Providing Private Assessments**

   Plaintiffs argue that the law only imposes two prerequisites
for reimbursement, namely, that the parents prove that the school
district denied their child a FAPE, and that private placement is
appropriate.  They assert that Judge O'Connor improperly imposed an
additional prerequisite by requiring them to provide private
evaluations to MCPS.  Plaintiffs maintain that there is no
requirement that parents provide private evaluations to the school
district, and that, under Maryland law, MCPS should have completed
its own evaluation of Ben by no later than June 1, 2005.  This

issue mirrors the procedural issue discussed above.   Inasmuch as
the issue was not included in the hearing request, it was not
directly addressed by the ALJ and will not be considered.[5]

   c.   **Meaningful Progress**

       Plaintiffs assert that Judge O'Connor's acceptance of Ms.
Solender's pronouncement that "any progress is meaningful" is
inconsistent with the legal standard set forth by Fourth Circuit
precedent and the IDEA.   Plaintiffs also take this remark out of
context.   The ALJ, relying on testimony of Ms. Hanson and Ms.
Solender, determined that Ben did make meaningful progress at
Wayside during the 2004-05 school year.   Judge O'Connor explained:

>             Looking at Ben's achieving mostly 3's on
>         the IEP objectives, Ms. Solender pointed out
>         that for Ben any progress i[s] meaningful, and
>         that the general trend of his development was
>         upward during the last two quarters of the
>         2005-2006 school year.   By April of 2005 (MCPS
>         ex. 9), Ben had made progress in most areas.
>         His behavior, according to Ms. Solender, was
>         much better and more manageable, he looked for
>         pictures of himself and his classmates, and
>         his eating skills had improved.   By June he
>         could identify some peers' pictures and had
>         made progress in using PCS symbols. (MCPS Ex.
>         19).

(ALJ Decision, at 35).   He did not say that any progress was
meaningful under the law.   Instead, he recounted testimony from an
observer who suggested that, given Ben's problems, any progress is

_____

       [5] Judge O'Connor did discuss the sequence of events and
concluded that the Plaintiffs made a tactical decision to delay
submission of the evaluations.   That finding is not tantamount to
concluding that they had an obligation to obtain them.

meaningful.  As long as Ben made more than trivial progress, and the weight of evidence shows that he did, the ALJ's findings were not in error.

### 4.   Regularity of ALJ's Findings of Fact

Plaintiffs assert that Judge O'Connor's findings of fact were not made in a regular manner.  Specifically, they argue that testimony from MCPS expert witnesses, Ms. Solender and Ms. Hanson, was inconsistent and misleading.  Plaintiffs further contend that Judge O'Connor ignored the superior experience and education of the parents' expert witnesses and gave greater weight to the testimony of Ms. Solender and Ms. Hanson because they personally worked with Ben.  According to Plaintiffs, the testimony of Ms. Solender and Ms. Hanson is replete with inconsistencies and misleading statements that were overlooked by Judge O'Connor.

"[I]n deciding what is the due weight to be given an administrative decision . . . a reviewing court should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." *Doyle*, 953 F.2d at 105.  The *Doyle* court concluded that a state administrative hearing officer erred in failing to give due weight to the credibility determinations of a local hearing officer who had actually taken direct testimony in that case, and thus afforded the state administrative hearing officer's findings, as to that credibility determination, no weight at all.  *Id.* at 105-06.  The

Fourth Circuit has since explained that a district court is not free to disregard a hearing officer's determination of which expert witnesses to credit where "the hearing officer's analysis and explanation for the basis of his ruling make it clear that he was not persuaded, and why he was not persuaded by the [party's] evidence." *County Sch. Bd. of Henrico County, Va. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 306-07 (4th Cir. 2005).

First, Plaintiffs assert that it was improper for Judge O'Connor to rely on testimony by Gretchen Solender, Ben's teacher at Wayside, regarding the private evaluations of Ben that Mrs. Synder obtained. Plaintiffs insist that Ms. Solender's testimony is unreliable, contradictory, and misleading. Specifically, they cite Mr. Solender's testimony that, upon hearing about the private evaluations, she and Dr. Siggers decided not to conduct their respective assessments of Ben because it would not be appropriate to have parallel assessments and public school evaluations at the same time. Plaintiffs argue that Ms. Solender subsequently testified that she thought the private assessments had nothing to do with the school and were conducted for the purpose of assisting Ms. Snyder in working with Ben at home. According to Plaintiffs, Ms. Solender contradicted her testimony again when she stated that the purpose of the June 9, 2005, IEP meeting was to evaluate Ben's eligibility for special education based on private assessments obtained by Ms. Snyder.

Judge O'Connor found, as a matter of fact, that "Ms. [Snyder] informed MCPS that she would be having private psychological, educational, and speech-language assessments of Ben conducted. Upon receiving this information, MCPS did not proceed with its plan to conduct its own psychological and educational assessments, *instead waiting to receive and review the private assessments*." (ALJ Decision, at 15) (emphasis added).   Additionally, Judge O'Connor found the following:

> MCPS did not pursue its planned educational and psychological assessments of Ben once it learned from Ms. [Snyder] that she was having private assessments done.  As MCPS personnel testified, private assessments do not preclude MCPS's own assessments.   However, MCPS's policy is not to perform its own evaluations when they would duplicate those being obtained by parents, but rather to review those private assessments when they are provided.

(ALJ Decision, at 26).  Plaintiffs' argument provides no basis for a determination that Judge O'Connor failed to make findings of fact in a regular manner.

Plaintiffs further assert that, contrary to Ms. Solender's testimony, Ms. Snyder gave the school a chance to address her concerns regarding Ben's progress.   Plaintiffs insist that Ms. Snyder informed the school about her concerns and the school had ample time to hold an IEP meeting before Ben went to Benedictine. Plaintiffs point to Ms. Snyder's unilateral notice letter to Ms. Kim, identifying her concerns and her plan to enroll Ben at Benedictine in the fall 2005 school year.

Ms. Solender testified:

>       Q:   What role, if any, did the fact that
>            Ms. [Snyder] expressed her happiness
>            with the program play in the
>            decision to continue the placement
>            at Wayside?
>
>       A:   She at no time ever expressed any
>            concerns about anything we were
>            doing, and I thought I had a good
>            relationship with her and with all
>            my other parents, and I constantly
>            communicate with them, if you have
>            any questions, any concerns let me
>            know so we can work on it.
>
>            If she didn't feel the program was
>            working, I would have wanted to know
>            what wasn't working, and I would
>            have done everything I can to make
>            it better, and after that if it
>            still wasn't working, we would have
>            looked at it, why it isn't working,
>            what's not going on, what can we do.
>            I would have gotten my supervisor
>            involved.   We would have meetings
>            and discussed what is not working.
>            If we can't make it work here, what
>            can we do.
>
>            And we never got that opportunity.
>            I never got the opportunity to make
>            a better program for Ben if she
>            wasn't happy.   I thought things were
>            going well.

(Paper 25, Hearing Tr. 810:2-811:4).   Based on this testimony,

Judge O'Connor found:

>       Ms. Solender testified that Ms. [Snyder] never
>       expressed dissatisfaction with the Wayside
>       program or Ben's progress throughout the 2004-
>       2005 school year.   Toward spring, Ms. [Snyder]
>       did state that she was looking into
>       residential placement, but indicated that her
>       inquiries were prompted by increasing concerns

28

>             about managing Ben at home and the safety of
>             Ben's younger sister.

(Paper 25, ALJ Decision, at 35).

Plaintiffs additionally contend that the testimony of Ms. Solender and Ms. Hanson related to their participation in the August 11, 2006, IEP meeting was misleading and inconsistent with the record. Plaintiffs assert that Ms. Solender testified that she attended the August 11, 2006, IEP meeting, and participated in writing the goals and objectives for the 2006-07 IEP, but did not participate in the decision regarding Ben's placement. Plaintiffs argue that, during the IDP meeting, Ms. Solender never said that Ben did not need a residential program because she was not a voting member of the team. Plaintiffs insist that it is well-established that IEP decisions are made by a consensus of the team and that voting is not the proper procedure by which to make IEP team decisions.

Judge O'Connor found that "Ms. Solender and Ms. Harris each testified that they opposed placement at Benedictine, but did not mention their opposition at either meeting because they had discussed it previously with the Central IEP Team." (ALJ Decision, at 31). Judge O'Connor's decision to credit Ms. Solender and Ms. Harris' testimony as to when they verbalized their opposition to Ben's placement at Benedictine reflects a determination of credibility that must be respected by this court. *See Justin G. v.*

*Bd. of Educ.*, 148 F.Supp.2d 576, 588 (D.Md. 2001); *Doyle*, 953 F.2d at 104.

Plaintiffs next argue that Ms. Solender and Ms. Hanson's testimony regarding "object constancy" or "object permanence" was not consistent with IEP for the 2006-07 school year, which they helped to develop.[6]  Plaintiffs assert that Ms. Solender testified that Ben had demonstrated object constancy in her class and that, based upon her review of the previous year's IEP, he probably had demonstrated the skill at that time as well.  According to Plaintiffs, the IEP for the 2006-07 school year, which Ms. Solender and Ms. Hanson helped to develop and signed, provides, under the section summarizing Dr. Spencer's assessment, that Ben "[h]as not developed 'Object Permanence.'"

Defendant counters that the mere fact that Ms. Solender and Ms. Hanson signed the IEP does not mean that they agreed with its contents.  Defendant insists that Ms. Solender and Ms. Hanson's signatures on the first page of the August 11, 2006, IEP indicate nothing more than the fact that they were "participants in attendance," and cannot be construed as establishing their agreement with the placement decision reached by the team for the 2006-07 school year.  Defendant further argues that both Ms.

_____

[6] The terms "object constancy" or "object permanence" refer to the developmental stage at which a child understands that an object that is removed from his view still exists.

30

Solender and Ms. Hanson disagree with Dr. Spencer's finding that
Ben had not developed object permanence.

Judge O'Connor addressed Dr. Spencer's testimony regarding
whether Ben had developed object constancy:

> Dr. Spencer tested Ben for object constancy by
> pulling [a spongy red apple] away from Ben to
> see if he tracked it visually, which he did
> only briefly.  When the apple was hidden, Ben
> did not look to see where it was, showing that
> he did not possess object constancy. . . .
> Upon cross-examination, Dr. Spencer examined
> the [Fairfax County Public Schools ("FCPS")]
> IEP of 2004 and stated a belief that the
> writer of this IEP must have thought that Ben
> had achieved object constancy, since there
> were no goals and objectives related to
> tracking and finding an object.  She also
> indicated that she did not ask Ms. Hanson
> whether Ben demonstrated object constancy at
> Wayside, but did say that she would disagree
> with Ms. Hanson if the latter's opinion were
> different from hers on this point.  She
> further testified that object constancy can
> "come and go" as the concept is being
> developed.  Significantly, Dr. Spencer
> admitted that it was "very likely" that she
> could not give an opinion whether Ben had made
> progress at Wayside because she observed him
> there only once.  She was able to state that
> Ben had made progress at Benedictine when she
> observed him there a year later, but that
> progress would relate only to the second prong
> of the *Burlington* test, the appropriateness of
> the private placement.

Judge O'Connor gave greater weight to Ms. Solender and Ms.
Hanson regarding object constancy because of their more frequent
contact with Ben.  His refusal to give greater weight to Dr.
Spencer's testimony regarding object constancy does not provide a

basis for finding that there was an irregular method of factfinding.

Plaintiffs further contend that Ms. Solender's and Ms. Hanson's documentation of Ben's progress during the 2004-05 school year is inconsistent with their testimony during the due process hearing.  Plaintiffs assert that, from September 2004 to December 2004, under the FCPS IEP, Ben had twenty-one objectives that he had been making progress toward achieving while attending FCPS, but when he started attending Wayside, his progress either stopped or slowed to such a degree that he could not achieve them.  Plaintiffs note Ms. Solender's testimony that the reason Ben had not achieved his goals and objectives was that he had regressed prior to starting her class.  Plaintiffs conclude that if Ben did regress, it was not until he entered Ms. Solender's class, and that his lack of progress in areas where he had previously shown progress was due to the inappropriateness of the program at Wayside.

Plaintiffs also argue that, from January 2005 to June 2005, Ben failed to make meaningful progress toward his IEP goals and objectives.  They point out that Ms. Solender's testimony that Ben made significant progress during the entire school year is not consistent with her own progress reports.  In addition, Plaintiffs assert that Ms. Hanson's testimony that Ben made a lot of progress from the start of the school year on his communication objectives from FCPS is inconsistent with the progress report she completed for Ben.  In June 2005, Plaintiffs observe, Ms. Hanson assessed

32

Ben's progress on eleven communication objectives and eleven speech and language objectives and, according to her assessment, Ben was not making enough progress to achieve any of his goals by the end of the IEP period.

Judge O'Connor found that "Ben did make meaningful educational progress under the IEP during the last two quarters of the 2004-2005 school year at Wayside, as testified to and reported by his teachers."   (ALJ Decision, at 38).   Judge O'Connor based this conclusion on the following factual findings:

> Ben made some progress in communication skills objectives between January and June of 2005. He achieved an approximation of the word "more" and made some progress answering "which" questions (MCPS Ex. 4, p. 455). Except for objectives that were not addressed during the period of evaluation, Ben achieved all 3's on the objectives as of June 2005, meaning that he made progress, but the objective may not be met by the end of the IEP period.
>
> Ben achieved all 3's on the articulation skills objectives as of June 2005.   "T" and "d" sounds were introduced between April and June, and Ben made some progress articulating these sounds (MCPS Ex. 4, p. 457).
>
> The goal of demonstrating improved responses in social and instructional situations refers to behavior.   By April 2005, Ben's improved behavior made him more available for learning than he had been in the beginning of the school year.   He achieved all 3+'s on the objectives in this area (MCPS Ex. 4, p. 459).
>
> On the goal of increasing literacy skills, Ben achieved a 4 on the objective or pointing to a picture or picture communication symbol (PCS), 3+'s on matching target vocabulary and

increasing vocabulary knowledge, and 3's on
the remaining objectives by June of 2005 (MCPS
Ex. 4, p. 462).   An achievement level of 4
means that progress has been made and it
appears that the objective will be met by the
end of the IEP period.

Ben achieved all 3's on the objectives under
the goal of increasing mathematical skills
(MCPS Ex. 4, p. 464).   He did not have the
concept of "one."

In the area of fine-motor skills, Ben achieved
a 4 on the objective of coloring fifty percent
of a defined space, and 3's on the other
objectives (MCPS Ex. 4, p. 466).

In self-care skills, Ben achieved a 5 (an
objective has been met) on putting his
notebook in a box, and managed 4's on using a
pincer movement to pick up one food item at a
time and getting a filled spoon or fork to his
mouth.   He was evaluated as a 3+ on spearing
food with a fork, and achieved 3's on all
other objectives in this goal (MCPS Ex. 4, pp.
468 & 470).

On the goal of completing career/vocational
tasks, Ben's objective of identifying his
classroom job was not introduced.   He achieved
3's on gathering necessary items and
performing the steps needed to complete the
job (MCPS Ex. 4, p. 472).

Ben did well on the goal relating to gross
mobility function.   He met the objectives of
ascending and descending stairs with a mark-
time gait, and was able to ascend with
alternating gait.   He also met the objectives
of negotiating curbs and bus stairs safely.
He achieved 4's on descending with alternating
gait, and ascending and descending stairs
without using a railing (MCPS Ex. 4, p. 474).

(ALJ Decision, at 12-13) (footnote omitted).

Defendant maintains that Plaintiffs' argument that Ben did not make progress during the 2004-05 school year amounts to nothing more than the argument that Judge O'Connor accepted the evidence presented by MCPS over that presented by their experts. Indeed, Plaintiffs' expert, Dr. Spencer, "admitted that it was 'very likely' that she could not give an opinion whether Ben had made progress at Wayside because she observed him there only once." (ALJ Decision, at 33). Additionally, "Ms. Solender also testified that [Ms. Snyder] never expressed dissatisfaction with the Wayside program or Ben's progress throughout the 2004-2005 school year." (*Id.* at 35). Plaintiffs' argument improperly challenges Judge O'Connor's determination that Ben made educational progress while attending Wayside and his view of the relative credibility of expert testimony and written evaluations that formed the basis of his determination. *See Justin G.*, 148 F.Supp.2d at 588; *Doyle*, 953 F. 2d at 104. Plaintiffs have not pointed to evidence requiring the court to reject Judge O'Connor's finding that Ben made meaningful progress during the 2004-05 school year.

Plaintiffs further argue that Ms. Solender gave false and misleading testimony regarding the classroom observations of Dr. Spencer and Ms. Blattner. Plaintiffs observe that, according to Ms. Solender's testimony, Ms. Hanson was visibly upset, to the point of being tearful, when Dr. Spencer asked her about her training and experience, thereby disrupting the entire class. Ms.

Hanson testified, however, that she was only working with Ben at the time of this encounter.   On the basis of that evidence, Plaintiffs argue that Ms. Solender's testimony was misleading, as the entire class could not have been disrupted because Ms. Hanson was working only with Ben.

Additionally, Plaintiffs assert that Judge O'Connor should have found that Ms. Solender was not a credible witness because of her testimony regarding Ms. Blattners' claim that a pillow was attached to Ben's desk for safety.   Defendant counters that Plaintiffs mischaracterize Ms. Hanson's testimony, failing to recognize that Ms. Hanson also testified that, in addition to safety reasons, the pillow was placed there "to reduce sensory feedback that [Ben] was getting from banging on the hard surface." (Due Process Hearing Tr. at 996-97).

Judge O'Connor found that Ms. Solender "attached a pillow to the desktop to muffle [Ben's] banging."   (ALJ Decision, at 34). Assuming, *arguendo*, Judge O'Connor's opinion misstates this fact, Plaintiffs have nevertheless failed to identify any authority for the proposition that such a minor factual error in a lengthy written opinion would support a finding that an administrative law judge's other factual findings were not regularly made.   This minor factual error would not implicate the manner and methods of fact-finding, nor would it provide a basis for a finding that the findings of fact were not regularly made.

Finally, Plaintiffs argue that the testimony of Ms. Solender
and Ms. Hanson regarding Ben's choking is inconsistent with the
record.   Plaintiffs assert that Ms. Solender and Ms. Hanson
testified that an important factor in the IEP team's decision to
approve a residential placement for Ben for the 2006-07 school year
was his risk of choking.   Plaintiffs point out that despite this
testimony choking was never mentioned at the August 11, 2006, IEP
meeting.   The discussion of choking, or lack thereof, during the
August 2006 IEP meeting to determine Ben's placement for the 2006-
07 school year is irrelevant to the determination for the 2005-06
school year.   For reasons stated above, Plaintiffs have provided no
basis for finding that Judge O'Connor's findings of fact were not
regularly made.

## IV. Motion for Leave to File Surreply, or in the Alternative Motion to Strike, and Request to Hear Additional Evidence

Pursuant to Local Rule 105.2(a), surreply memoranda are not
permitted unless otherwise ordered by the court.   "Surreplies may
be permitted when the moving party would be unable to contest
matters presented to the court for the first time in the opposing
party's reply." *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md.
2003), *aff'd*, 85 Fed.Appx. 960 (4th Cir. 2004).

Plaintiffs filed a motion for leave to file a surreply,
asserting that Defendant: (1) raised an argument for the first time
in its reply papers, (2) made a serious misstatement of the facts,

and (3) waived an argument by failing to raise it at the administrative hearing.

Plaintiffs claim that Defendant argued for the first time in its reply papers that the parents failed to give consent for the evaluations the IEP team had ordered at the March 3, 2005, IEP meeting.   As Defendant correctly notes, however, Plaintiffs themselves raised this question in their memorandum in support of their motion for summary judgment.   There, Plaintiffs argued, "Ms. Snyder testified that she gave consent for the MCPS to complete the assessments it requested . . . and never withdrew that consent. Even when she decided to have private evaluations, she never intended to substitute them for the school's assessments." (Paper 15, at 9).   Plaintiffs may not file a surreply to address an argument that was previously briefed.

Plaintiffs further assert that Defendant's argument that the parents failed to give consent for the evaluations the IEP team ordered at the March 3, 2005, IEP meeting seriously misstates the facts.   As previously noted, a surreply is permitted to address matters raised for the first time in a reply.   Here, Plaintiffs seek to address alleged factual inaccuracies in Defendant's reply. To the extent that Plaintiffs seek to reopen briefing on disputed factual matters, the motion for surreply will be denied.

Plaintiffs further allege that the Board waived its opportunity to argue lack of consent related to the evaluations

following the March 2005 meeting by failing to object to testimony on that issue during the administrative hearing. Again, Plaintiff's argument does not address matters raised for the first time in Defendant's reply, but seeks to reopen briefing regarding MCPS's alleged failure to complete assessments. Accordingly, Plaintiffs' motion for leave to file surreply will be denied.

Alternatively, Plaintiffs request that the court strike portions of Defendant's reply that contain factual misstatements or raise new arguments. Specifically, Plaintiffs request that any argument by Defendant that the parents did not consent to assessments and any factual statements supporting that argument be stricken because it was not raised at the hearing and is based on mistaken facts. For the reasons stated above, Plaintiffs' motion to strike will also be denied.

Plaintiffs also request, pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii), that the court hear additional testimony from Ms. Solender, Ms. Hanson, Ms. Blattner, and Dr. Spencer regarding issues about which the MCPS witnesses purportedly gave misleading testimony.[7] Plaintiffs argue that Ms. Solender and Ms. Hanson's testimony was often inconsistent, contradictory, and in conflict with the record, while Ms. Blattner and Dr. Spencer gave credible testimony that was consistent and supported by the record.

---

[7] Section 1415(i)(2)(C)(ii) provides that "[i]n any action brought under this paragraph, the court . . . shall hear additional evidence at the request of a party . . . ."

Plaintiffs conclude that hearing additional testimony from each of these witnesses will provide the court the opportunity to make independent credibility determinations.

"[D]istrict courts have the discretion to tailor their proceedings and to limit the introduction of 'additional evidence' under the IDEA." *Schaffer*, 554 F.3d at 476.  In *Springer*, 134 F.3d at 666-67, the Fourth Circuit explained:

> We construe "additional" in the ordinary sense of the word . . . to mean supplemental. Thus construed, this clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of "additional."  We are fortified in this interpretation because it structurally assists in giving due weight to the administrative proceeding, as *Rowley* requires. [quoting *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984)].
>
> . . . A lax interpretation of "additional evidence" would "reduce the proceedings before the state agency to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial *de novo*." *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 997 (1st Cir. 1990), *cert. denied*, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991).  Therefore the exclusion of "testimony from all who did, or could have, testified before the administrative hearing" would be "an appropriate limit in many cases." *Burlington*, 736 F.2d at 790.  We, along with other circuits, adopt the *Burlington* approach.

Here, Plaintiffs insist that Judge O'Connor gave weight to the testimony of witnesses where the record reveals that their testimony was not credible, and that re-hearing the testimony of

each of these witnesses will provide the court the opportunity to make credibility determinations of its own. Each of these witnesses testified at length before Judge O'Connor. Plaintiffs acknowledge that the court "may not reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility." *Doyle v. Arlington County School Bd.*, 953 F.2d 100, 104 (4th Cir. 1991) (internal marks omitted). They insist, however, that based on *Bd. of Educ. of Montgomery County v. S.G.*, 230 Fed.Appx. 330, 334 (4th Cir. 2007) (unpublished), the Fourth Circuit has "rejected the argument . . . that the hearing officer must always defer to the school's experts." In *S.G.*, the Fourth Circuit affirmed this court's ruling that the ALJ properly gave greater weight to the parents' experts, but the experts at issue there were not the same as those in this case. As this court observed, *S.G.* did not involve "a battle of *educational* experts where the ALJ sided with the parents' experts. Instead, a comprehensive analysis of S.G.'s needs required an evaluation of the interaction between S.G.'s psychiatric issues and the problems she was having at [school], and the school's *educational* experts were not as qualified to make judgments about S.G.'s needs as were, for example, her psychiatrist." *Bd. of Educ. of Montgomery County v. S.G.*, No. 05-cv-323 DKC, 2006 WL 544529, at *11 (D.Md. Mar. 6, 2006) (emphasis in original).

This case is factually distinguishable from *S.G.* because both sets of experts are educational experts assessing Ben's educational needs.  Judge O'Connor stated, after "[w]eighing the conflicting opinions of these four experts, I give greater weight to those of Ms. Solender and Ms. Hanson because of their much greater experience working with Ben." (ALJ Decision, at 37).  "Here, the ALJ, after carefully considering all of the testimony, did in fact 'discuss[] in detail [his] reliance as well as [his] rejection of particular testimony and evidence.'" *S.G.,* 230 Fed.Appx. at 334 (quoting *S.G.*, 2006 WL 544529, at *22).  Thus, in addition to being repetitive, it is unnecessary to hear additional expert testimony because it was reasonable for Judge O'Connor to give greater weight to the MCPS experts over Plaintiffs' experts.  "[T]he fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." *Justin G.*, 148 F.Supp.2d at 588 (quoting *Bd. of Educ. of Montgomery County v. Hunter ex rel. Hunter*, 84 F.Supp.2d 702, 706 (D.Md. 2000)); *see also Doyle*, 953 F.2d at 104.  Accordingly, Plaintiffs' request to hear additional evidence will be denied.

## V.   Conclusion

For the foregoing reasons, Plaintiffs' motion for leave to file surreply and motion to strike will be denied, Plaintiffs' motion for summary judgment will be denied, and Defendant's cross-

motion for summary judgment will be granted.  A separate Order will follow.

                              _____/s/_____
                              DEBORAH K. CHASANOW
                              United States District Judge